UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                Civil No. 16-3019 (PAM/FLN)

      Petitioner,

v.

                                        **REPORT AND**
Patrick Brown Thunder,                        **RECOMMENDATION**

      Respondent.

Chad Blumenfied, Assistant United States Attorney, for Petitioner.
Douglas Olson for Respondent Patrick Brown Thunder.

**THIS MATTER** came before the undersigned United States Magistrate Judge on Petitioner United States of America's ("the Government")  Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 (ECF No. 1). On February 2, 2017, a hearing was held at the Federal Medical Center at Rochester, Minnesota ("FMC-Rochester") to determine whether Respondent Patrick Brown Thunder is suffering from a mental disease or defect for which he is in need of care or treatment. Chad Blumenfield, Assistant United States Attorney, appeared on behalf of the Government; Douglas Olson, Federal Public Defender, appeared on behalf of Thunder. Thunder was present during the hearing and testified on his own behalf.  At the hearing, the United States presented the testimony of John McKenzie, Psy.D, and Kwame Gyasi, MD, who were admitted as experts without objection from Respondent.[1] Both parties submitted Post-hearing Memoranda. *See* ECF Nos. 13, 15. This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below,

---

[1] The Government's exhibits and witnesses are outlined in an Exhibit and Witness List posted to CM/ECF. *See* ECF No. 11.

the Court concludes that the Government has not met its burden and recommends the Petition be **DENIED**.

## I. BACKGROUND

### A. Incarceration at FMC-Rochester

Thunder is a 35-year old Native American male who is serving a 240-month sentence for one count of Sexual Abuse of a Minor, and one count of Sexual Abuse of a Person Incapable of Consenting, in violation of 18 U.S.C. §§ 1153, 2242(2), 2243(a), and 2246(2). Gov't Ex. 1; Pet. Ex. A, ECF No. 1. He has a good conduct release date of January 23, 2029. ECF No. 1, Ex. B. Judgment was imposed on March 19, 2013, and Thunder received his initial intake screening at FMC-Rochester on April 29, 2013. Gov't Ex. 1 at 1; ECF No. 1, Ex. A. During the initial screening, Thunder was designated as a patient without a history of mental health issues and was enrolled in the work cadre population at FMC-Rochester. ECF No. 1, Ex. A at 3. "Between April 2013 and November 2015, Mr. Brown Thunder was stable in the general population." *Id.* On November 6, 2015, Thunder had the only fight he has ever been involved in while incarcerated. Gov't Ex. 2. The Disciplinary Hearing Officer ("DHO") held a hearing to discuss the fight on December 8, 2015. *Id.* During the hearing, Thunder admitted to fighting, did not present any documentary evidence, and did not request appointed staff representation. *Id.* The DHO summarized Thunder's statement at the hearing as follows:

> It led to over a year ago when [my cellmate] first moved in. [He g]ot into it with everyone. It is his hygiene. People get tired of things. I was not trying to be an enforcer. [I] asked him to pick things up. He struck me. We both hit each other. He's been telling people what we have been charged for. He has paperwork on our crimes. . . . I made a mistake and I learned from it. Yes, we were fighting.

*Id.* The DHO found Thunder competent and responsible for his behavior at the time. *Id.* Thunder

2

was not assessed for competency by psychology services. Gov't Ex. 1 at 3.

On November 20, 2015, Psychology Intern Amanda Knoll interviewed Thunder while he was placed in a segregated housing unit ("SHU"). Gov't Ex. 3. She indicated that Thunder had "no significant mental health issues" and noted that he was a "low" threat to himself or others. *Id.* Thunder was "well-groomed and dressed appropriately" during the interview and "denied experiencing any mental health problems since entering segregation." *Id.* He also reported "sleeping better" because his cellmates were not bothering him by peeing on his laundry and putting bugs in his bed when he leaves the room. *Id.*

On May 27, 2016, Dr. Jason Gabel saw Thunder for treatment of medical complaints that Thunder attributed to "inmates putting chemicals in his hair and on his property . . . [and] putting bugs in his bed." Gov't Ex. 4. Thunder stated that he was experiencing hair loss, upset stomach, and blood in his stool. *Id.* Dr. Gabel characterized Thunder's complaints of harassment as "perceptions" and stated that Thunder "suspected his perceived harassment would ultimately result in a physical confrontation." *Id.* at 2. Dr. Gabel opined that "it appears Mr. Brown Thunder has been experiencing paranoid delusional beliefs for at least 18 months . . . [but] adamantly denied depression and ideation/intent for suicide and self-harm." *Id.* Thunder agreed to be moved to the mental health unit to "alleviate his difficulties with peers." *Id.*

On July 19, 2016, Thunder was moved into seclusion and met with Dr. McKenzie for the first time. Gov't Ex. 5. Dr. McKenzie stated that Thunder "did not understand why he had been moved to seclusion and why he was in the mental health building. During the interview, [Thunder] continued to espouse his delusions around bed bugs being maliciously placed in his bed, blood from his stool, and paranoia about being poisoned." *Id.* Thunder declined treatment and denied having

3

a mental illness. *Id.*

## B. Mental Health Assessment

Shelly Stanton, MD, performed a mental health assessment of Thunder while he was placed in SHU on July 20, 2016. Gov't Ex. 6. She noted that Thunder was admitted to the Mental Health Diagnostic and Observation service on July 17, 2016, "related to ongoing difficulties functioning in the population due to delusions and hallucinations." *Id.* He was "becoming increasingly agitated." *Id.* at 2. Thunder told Dr. Stanton that he believed that because he is a Native and a sex offender, other inmates were possibly peeing on his laundry, and putting something on his skin and hair while he was sleeping that was causing his hair to fall out, him to have skin issues, and causing his teeth to rot. *Id.* at 1. Dr. Stanton noted that he was seen by psychology services on December 1, 2015, related to these complaints and had been treated for exzema and dyshydrosis. *Id.* at 1. Thunder denied wanting to harm anyone, but Dr. Stanton noted that there were photocopies from a martial arts book found in his cell when he was being moved into seclusion. *Id.* at 2. Dr. Stanton observed that Thunder had never attempted suicide, and that other than his violent crime, he had only been in the November 2015 fight. *Id.* Dr. Stanton observed that Thunder was neatly groomed and cognitively alert. *Id.* at 3. However, she opined that he was describing auditory, olfactory, tactile, and visual hallucinations and that his judgment was impaired because "[w]hen asked what he would do with a stamped addressed letter he found on the sidewalk, he replied, 'I would leave it there.'" Dr. Stanton diagnosed Thunder with schizophrenia or schizoaffective disorder. *Id.* at 3. She also ordered labs to look into recent blood in his stool and stomach pain and observed "[l]abs show white count and B-12 which is possibly indicative of malnutrition or may indicate some other condition

4

which we will investigate." *Id.* at 4.

**C.     Mental Health Evaluation**

Dr. McKenzie completed a mental health evaluation of Thunder on August 2, 2016. Gov't Ex. 1. McKenzie testified at the hearing that because he and Thunder do not have a good relationship, McKenzie's report is based on: (1) clinical interviews conducted by his students, interns, and other mental health professionals at FMC-Rochester; (2) the Pre-Sentence Investigation Report ("PSI"); (3) the Psychology Data System ("PDS"); (4) the Bureau Electronic Medical Record ("BEMR"); (5) the information system "SENTRY"; and (5) Thunder's Central File. *See id.* at 1. Indeed, the only report authored by McKenzie preceding the preparation of the mental health evaluation entered into evidence is the initial July 19, 2016 conversation that McKenzie had with Thunder. Gov't Ex. 5. Although Dr. Stanton had diagnosed Thunder with schizophrenia or schizoaffective disorder, McKenzie's mental health evaluation and testimony, as well as the Government's Petition, asserts that Thunder suffers from Delusional Disorder, Mixed Type, for which he requires psychiatric hospitalization and treatment under the provisions of 18 U.S.C. § 4245. Gov't Ex. 1 at 9–10; ECF No. 1. *But see* Gov't Ex. 6 at 3.

In his report, Dr. McKenzie relies on the PSI to document that Thunder received a competency evaluation around the time of his offense and was found competent to stand trial with "no symptoms of an affective or psychotic disorder." Gov't Ex. 1 at 2 (quotations in the original). McKenzie stated that Thunder was stable between April 2013 and November 2015 before being referred to psychology services following his only fight. *Id.* at 3. On November 9, 2015, Thunder indicated that he was excessively cleaning his bed and refusing to put the sheets on because he was concerned that his cellmates were peeing on his clothes, putting oil in his hair while he was working

5

food service, and putting bugs in his bed. *Id.* at 3–4. Thunder did, however, acknowledge that the bugs in his bed "may have come into this living quarters as a result of open food containers or inadequate cleaning." *Id.* at 3.

On December 1, 2015, Thunder was diagnosed in PDS as having: "Unspecified Anxiety Disorder; Rule Out Anxiety Due to General Medical Condition; Rule Out Delusional Disorder, Persecutory Type." *Id.* at 4. The treatment provider who made this diagnosis observed that "it was unclear at this time whether [Thunder's] concerns were the result of misinterpretation of symptoms associated with a general medical condition or were indicative of underlying psychotic disorder." *Id.* Thunder was placed in locked housing and after he was released on December 18, 2015, he reported to a psychology intern that he was "doing fine" and that he did not believe his new roommates were making similar attempts to harass him. *Id.*

In January and February 2016, Thunder stated that he believed he was being harassed again in his meetings with psychology interns. *Id.* at 4–5. On March 28, 2016, Thunder did not voluntarily present to his appointment. *Id.* After being forced to meet with a psychology intern by a correctional officer, Thunder stated that he may as well "beat the shit" out of another inmate who was reportedly bothering him "if [he] has to keep coming here," referring to monthly contacts with psychology staff. *Id.* at 5. The intern felt threatened and referred Thunder for a tele-psychiatry evaluation when he stated "You keep doing things to people; they get tired of it and want to do something about it . . . I'm just saying for anyone." *Id.*

In April 2016, another inmate reported that Thunder had been complaining about a female correctional officer searching him on a nightly basis and about "white boys" putting something in his shampoo to make him lose his hair. *Id.* Thunder denied this in his April 19, 2016 psychology

6

appointment. *Id.* McKenzie includes a summarization of Dr. Gable's May 27, 2016, treatment report. *Id.* at 5–6; *see supra*.

On July 16, 2016, Thunder was interviewed by psychology intern based on reports by other inmates that Thunder was hallucinating and making statements about harming them. *Id.* at 6–7. Thunder reported that he believed at least one inmate was putting bugs in his bed and stated "I am on the edge, about to cut the head off the snake," but that he didn't want to lose any more good time. *Id.* at 7. Following this statement, Thunder was classified as having acute mental illness and was placed in restrictive housing. *Id.* at 7.

### D. Post-Evaluation Clinical History

During the February 2, 2017 hearing on the Government Petition, the Government admitted psychology services notes from September 9, 2016 through January 24, 2017. *See generally* Gov't Ex. 7. These notes are primarily prepared by Dr. McKenzie and document his observation of Thunder since the preparation of his August 2016 mental health evaluation. *Id.* The Government also admitted a letter written by Thunder in which he explains the harassment he feels he has been receiving at the hands of other inmates and discusses the distrust he feels with medical staff at FMC-Rochester because he does not want to take psychotropic medication. Gov't Ex. 8. This letter was discussed in McKenzie's September 9, 2016 treatment note, which summarized the letter as Thunder's expression that he does not need medication and that he is not mentally ill, but that his psychiatrists do not believe him. Gov't Ex. 7 at BOP_001477. On September 12, 2016, Thunder refused to speak to the psychiatry staff other than to say thank you and to inform them that does not have a mental illness or need treatment. *Id.* at BOP_001476. It was also noted that Thunder spends the majority of his day "listening to music/reading" and that secured housing "continues to be

7

warranted due to his mental illness, history of violence related to his illness, and current refusal to engage in any type of treatment." *Id.* at BOP_001475. While McKenzie notes on September 13, 2016 that Thunder was dismissive and refused to speak with his treatment team, a psychology intern noted the very next day that Thunder was "[o]verall cooperative, however, his responses were brief and generally vague." *Id.* at BOP_001474–73. Throughout the rest of September 2016, Thunder does not engage with his treatment staff and then reportedly called McKenzie a "white piece of shit" on September 30, 2016. *Id.* at BOP_001467. McKenzie felt threatened from this statement and an incident report was written up. *Id.* Daniel Carlson, PsyD, noted in his October 3, 2016, Institution Disciplinary Report that he believed Thunder was "competent to participate in disciplinary proceedings, and he should be considered responsible for his behavior at the time of the [September 30th] incident." *Id.* at BOP_001465.

Throughout October 2016, Thunder continues to refuse to speak with his treatment team and often turns off his light or covers himself with his blanket when they attempt to speak with him. *Id.* at BOP_1464–1460. On October 13, 2016, Thunder stated that he feels safe in seclusion, but didn't know why he was sent here. *Id.* at BOP_1460. On October 14, 2016, McKenzie documents that Thunder spoke to a physician assistant ("PA") and had been complaining about a urinary problem for about a month. *Id.* at BOP_001459. McKenzie did not document that any additional testing was performed and, despite having never directly discussed the problem with Thunder, opined that "his urine frequency is related to a psychological disorder." *Id.* Thunder also stated that he felt mental health staff were putting things in his coffee, food, and bed. *Id.* Thunder told McKenzie on October 14 that he agreed to try taking a small dose of psychotropic drugs at bedtime to see if it would help with his urinary problem, but that he would stop the medication if it did not improve his symptoms.

8

*Id.* at BOP_001458–59. Thunder began refusing his medication on October 21, 2016. *Id.* at BOP_001453. McKenzie then reported that Thunder threatened him on October 24 and 25, 2016 when he said "[t]his is all because of you (he then pounded on the door), when I get out of here, I'm going to come and find you," *id.* at BOP_001452 (quotations in the original), "[y]ou haven't seen me angry yet." *Id.* at BOP_001451.

Thunder continued to ignore and not engage with his treatment team throughout November 2016. *Id.* at BOP_001451–39. He yelled at McKenzie on November 10, 2016, "stay away, I'll do whatever, [y]ou're lucky I'm not out there." *Id.* at BOP_001438. McKenzie documented his belief that Thunder was further decompensating. *Id.* at BOP_001439–29. On November 25, 2016, Thunder told the psychology intern that a PA explained to him that "his brain controls how his body is functioning and the medication he was previously prescribed would help his brain and body function." *Id.* at BOP_001429. Thunder told the intern that his previous refusals to speak with her were due to McKenzie being present. *Id.*

Again, the documentation shows that Thunder was not communicative with his treatment team throughout December 2016. *Id.* at BOP_001428–16. On December 23, 2016, Thunder reported excessive urinary problems to Melissa Klein, Ph.D., LP, and asked to see a neurologist. *Id.* at BOP_001412. He also told her that the staff were not helping him and that he was urinating between 20 and 25 times per day. *Id.* Dr. Klein noted that Thunder appeared calm, appropriate, and not distressed. *Id.*

Thunder continued to not communicate with his treatment team into January 2017. *Id.* at BOP_001411–03. Indeed, Dr. McKenzie recorded on January 9, 2017 that 100% of Thunder's treatment sessions had been incomplete. *Id.* at BOP_001403. Thunder also continued to express

9

distrust in his treatment team, including his belief that they may be forcing him to take medication, discharging gas into his cell, and preventing him from getting and receiving his mail. *Id.* at BOP_001411–00. Thunder refused to speak with McKenzie from January 18, 2017 through January 24, 2017. *Id.* at BOP_001398–95.

On January 17, 2017, McKenzie reported Dr. Gyasi had performed "a complete medical work-up" on Thunder and determined that there was absolutely no medical basis for Thunder's medical complaints. *Id.* at BOP_001399. In Dr. Gyasi's clinical encounter note which he authored on January 27, 2017 regarding a medical visit he made on December 14, 2016, Dr. Gyasi stated that he went to visit Thunder regarding a bilateral rash on his arms. Gov't Ex. 10. Dr. Gyasi testified at the hearing that he looked at Thunder's arms through the cell bars before opining that Thunder was "self inflicting the redness on his arms" by excessively scratching his skin. *Id.* Thunder testified that he was already receiving ointment for his rash and that although Dr. Gyasi looked at his rash, the purpose of his request for medical attention was his urinary problem. Thunder also stated that Dr. Gyasi spent less than a few minutes with him during this December 14, 2016 visit, which Dr. Gyasi does not dispute. Dr. Gyasi testified that he did not perform any urinalysis testing to determine if Thunder was suffering from a urinary tract infection, nor did he order any kind of neurological diagnostic testing, despite Thunder's requests, because Dr. Gyasi "viewed [Thunder] as primarily delusional." Gov't Ex. 7 at BOP_001399.

**E.     The Government's Petition**

Thunder has been in seclusion at the mental health unit at FMC-Rochester since July 19, 2016. Gov't Ex. 5. The Petition alleges that Thunder is suffering from Delusional Disorder, Mixed Type, and that he is need of treatment. ECF No. 1 ¶ 5. The Government contends that Thunder's

"paranoid and delusional beliefs place him at risk of causing harm towards others . . . which ha[s] resulted in his placement in Seclusion for the safety of others." *Id.* The Petition also alleges that Thunder has refused care and treatment at FMC-Rochester due to his lack of insight into his disease which "prevents him from recognizing the presence of his mental illness and need for mental health treatment." *Id.* The Government petitions the Court to find that there is reasonable cause to believe that Thunder may presently be suffering from a mental disease or defect for which he is in need of custody for care or treatment. *Id.* The Government requests that Thunder be committed to the custody of the Attorney General for placement in an open housing unit, enabling Thunder to participate in group therapy, individual therapy, activity therapy, drug treatment, and other programming to prepare him for reentry into the community. *Id.*

## II. STANDARD OF REVIEW

Under 18 U.S.C. § 4245, an inmate who is serving time in a federal prison may not be committed to a mental hospital for care and treatment without the prisoner's consent or a court order. *See* 18 U.S.C. § 4245; *United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990) (vacated in part on other grounds by *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990)). If the inmate objects to being committed, the court must order a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); *United States v. Jones*, 811 F.2d 444, 447 (8th Cir. 1987). If after a hearing, the court finds by a preponderance of the evidence that the prisoner is suffering from a mental disease or defect for which he needs treatment in a psychiatric facility, the court will commit him to the custody of the Attorney General, who will hospitalize the person for treatment in a psychiatric section of a prison.

*See Watson*, 893 F.2d at 975 (citing 18 U.S.C. §4245(d)).  If an inmate whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population, then treatment is needed within the meaning of 18 U.S.C. § 4245. *See Horne v. United States*, 955 F. Supp. 1141, 1149 (D. Minn. 1997).

### III. LEGAL ANALYSIS

Assuming without deciding that Thunder is suffering from some kind of mental disease or defect, the Court concludes that the Government has not established reasonable cause to believe that Thunder is in need of custody for care or treatment in a suitable facility as required by 18 U.S.C. § 4245(a). Most importantly, the Court concludes that Thunder is not potentially dangerous to himself or others.

The evidence put forward by the Government shows that Thunder has made repeated bizarre statements for which he was committed to seclusion for mental health diagnostic and observation. Gov't Ex. 7 at BOP_001403. As of January 9, 2017, Thunder has never completed a psychiatric treatment session. *Id.* Thunder has also not been given treatment to determine, as at least one mental health professional opined in December 2015, "whether [Thunder's] concerns were the result of misinterpretation of symptoms associated with a general medical condition or were indicative of underlying psychotic disorder." Gov't Ex. 1 at 4. Thunder has requested neurological testing and urinanalysis to help treat his physical symptoms. *See generally* Gov't Ex. 7. It appears that McKenzie, who has never been able to perform a mental health assessment of Thunder, has dismissed his continuous complaints as delusions without any additional testing.

McKenzie testified and noted in his mental health evaluation that he relied on the clinical interviews conducted by his students, interns, and other mental health professionals at FMC-

Rochester; the PSI; the PDS; and Thunder's incarceration records. Gov't Ex. 1. However, Dr. Stanton's diagnosis is not adopted by McKenzie even though her observations in her assessment are. Gov't Ex. 6. The PSI indicated that Thunder was competent and not suffering from any mental health disorder. Gov't Ex. 1. The PDS records at least one mental health professional, on December 1, 2015, ruling out delusional disorder. *Id.* Finally, BEMR, SENTRY, and Thunder's Central File, shows that Thunder has had one fight. *Id.* Regarding the fight, a DHO determined that Thunder was competent and during the hearing Thunder specifically told the DHO that he "made a mistake and [he] learned from it." Gov't Ex. 2. The record does not support McKenzie's conclusion that Thunder has shown a history of violence or suicidal ideation since he has been incarcerated at FMC-Rochester. Gov't Exs. 1, 7.

The Court is also not convinced that the record supports McKenzie's assertion that Thunder has been making "thinly veiled threats." Gov't Ex. 1. In March 2016, Thunder stated that he may as well "beat the shit" out of another inmate who was reportedly bothering him "if [he] has to keep coming here" referring to monthly contacts with psychology staff. Gov't Ex. 1 at 5. Thunder had not voluntarily come to this particular psychiatric appointment and had to be brought there by an officer. *Id.* The intern felt threatened by his statement that, "[y]ou keep doing things to people; they get tired of it and want to do something about it . . . I'm just saying for anyone." *Id.* Thunder did not say that he was going to hurt anyone but was expressing that he did not want to be forced to attend monthly psychiatric sessions. Then in July 2016, he stated "I am on the edge, about to cut the head off the snake," but that he didn't want to lose any more good time. *Id.* at 7. Thunder testified at the hearing that what he meant by this statement was that he wanted to get to the bottom of the harassment he felt he was experiencing from other inmates and to figure out where the bugs that were in his bed

13

were coming from.

    McKenzie has reported a number of allegedly threatening statements made by Thunder that may also be interpreted as Thunder trying to push McKenzie away when he visits his cell. Gov't Exs. 1, 7. The treatment notes show that Thunder did not want to receive treatment and does not trust Dr. McKenzie. Gov't Ex. 7. This is reflected in the fact that Thunder has never engaged in treatment and at one point told McKenzie's intern that he does not want to speak to her when McKenzie is present. *Id.* at BOP_001429. On September 30, 2016, McKenzie noted and wrote up an incident report after Thunder called him a "white piece of shit" *Id.* at BOP_001467. In Dr. Carlson's opinion and evaluation of Thunder after he made this statement, Thunder was "competent to participate in disciplinary proceedings, and he should be considered responsible for his behavior at the time of the incident." *Id.* at BOP_001465. This shows that even after Thunder has been in seclusion, at least one mental health professional believes that Thunder is competent. On October 24 and 25, 2016, Thunder yelled at McKenzie, "[t]his is all because of you (he then pounded on the door), when I get out of here, I'm going to come and find you," *id.* at BOP_001452 (quotations in the original), "[y]ou haven't seen me angry yet." *Id.* at BOP_001451. On November 10, 2016, Thunder stated, "stay away, I'll do whatever, You're lucky I'm not out there." *Id.* at BOP_001438. While Thunder is certainly not kind or respectful to McKenzie, it does not appear that he desires to hurt him, but just that he does not want to receive treatment from him and is annoyed by McKenzie's visits.

    While the Court agrees that there is ample evidence that Thunder may be suffering from some kind of delusion, the Government has not met its burden to prove by a preponderance of the evidence that Thunder should be placed in custody for treatment. McKenzie has never been able to complete a clinical assessment of Thunder. In completing his evaluation of Thunder, McKenzie

relied on Stanton's underlying observations, but disregarded her diagnosis. McKenzie also relied on the observations, but disregarded the diagnosis of a December 1, 2015 psychology services report, which ruled out that Thunder suffered from delusional disorder. Dr. Gyasi's "complete medical work-up" of Thunder, which was completed within minutes and through the bars of his cell, does not constitute a showing that Thunder suffers from delusions. Indeed, at least one provider has felt that additional testing should be performed to determine "whether [Thunder's] concerns were the result of misinterpretation of symptoms associated with a general medical condition or were indicative of underlying psychotic disorder." Gov't Ex. 1 at 4. Stanton corroborated this in her assessment in stating, "[l]abs show white count and B-12 which is possibly indicative of malnutrition or may indicate some other condition which we will investigate." Gov't Ex. 6 at 4. There is no documentation that such testing has been ordered to treat or better understand Thunder's physical symptoms. Therefore, McKenzie's report and testimony—which relies on the medical opinions of others who reached different conclusions, the bizarre statements made by Thunder, and the November 2015 fight (that Thunder admitted fault in and stated that it was a mistake he learned from), is not enough to satisfy the Government's burden to show by a preponderance of the evidence that Thunder is in need of custody for care or treatment.

## IV. RECOMMENDATION

Based on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Government's Petition (ECF No. 1) be **DENIED**.

DATED: February 24, 2017             *s/Franklin L. Noel*
                                     FRANKLIN L. NOEL
                                     United States Magistrate Judge

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).